E-FILED
Friday, 17 July, 2026 05:20:57 PM
Clerk, U.S. District Court, ILCD

# BUSINESS ASSOCIATE AGREEMENT
# SANGAMON COUNTY, ILLINOIS

## Definitions

Catch-all definition:

The following terms used in this Agreement will have the same meaning as those terms in the HIPAA Rules (https://www.federalregister.gov/articles/2013/01/25/2013-01073/modifications-to-the-hipaa-privacy-security-enforcement-and-breach-notification-rules-under-the): Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

Specific definitions:

(a) Business Associate. "Business Associate" will generally have the same meaning as the term "Business Associate" at 45 CFR 160.103, and in reference to the party to this agreement, will mean Advanced Correctional Healthcare, Inc.

(b) Covered Entity. "Covered Entity" will generally have the same meaning as the term "Covered Entity" at 45 CFR 160.103, and in reference to the party to this agreement, will mean Sangamon County Jail.

(c) HIPAA Rules. "HIPAA Rules" will mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

## Obligations and Activities of Business Associate

Business Associate agrees to:

(a) Not use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

(b) Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement;

(c) Report to Covered Entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, within 48 hours (except for any breaches putting patients at immediate risk of harm, which should be reported as soon as possible) and any security incident of which it becomes aware;

(d) In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the Business Associate agree to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information;

(e) Make available protected health information in a designated record set to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.524;

(f) Make any amendment(s) to protected health information in a designated record set as directed or agreed to by the Covered Entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy Covered Entity's obligations under 45 CFR 164.526;

(g) Maintain and make available the information required to provide an accounting of disclosures to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.528;

(h) To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s); and

(i) Make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

**Permitted Uses and Disclosures by Business Associate**

(a) Business Associate may only use or disclose protected health information as necessary to perform the services set forth in the Agreement for the Provision of Health Services. The Business Associate is authorized to use protected health information to de-identify the information in accordance with 45 CFR 164.514(a)-(c).

(b) Business Associate may use or disclose protected health information as required by law.

(c) Business Associate agrees to make uses and disclosures and requests for protected health information consistent with Covered Entity's minimum necessary policies and procedures.

(d) Business Associate may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by Covered Entity, except for the specific uses and disclosures set forth below.

(e) Business Associate may use protected health information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(f) Business Associate may disclose protected health information for the proper management and administration of Business Associate or to carry out the legal responsibilities of the Business Associate, provided the disclosures are required by law, or Business Associate obtains

reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(g) Business Associate may provide data aggregation services relating to the health care operations of the Covered Entity.

**Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions**

(a) Covered Entity will notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of protected health information.

(b) Covered Entity will notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her protected health information, to the extent that such changes may affect Business Associate's use or disclosure of protected health information.

(c) Covered Entity will notify Business Associate of any restriction on the use or disclosure of protected health information that Covered Entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of protected health information.

**Permissible Requests by Covered Entity**

Covered Entity will not request Business Associate to use or disclose protected health information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by Covered Entity, except if the Business Associate will use or disclose protected health information for data aggregation or management and administration and legal responsibilities of the Business Associate.

**Term and Termination**

(a) Term. The Term of this Agreement will be effective as of the date of the last signature hereto, and will terminate on the termination of the Agreement for Health Services or the date Covered Entity terminates for cause as authorized in paragraph (b) of this Section, whichever is sooner.

(b) Termination for Cause. Business Associate authorizes termination of this Agreement by Covered Entity, if Covered Entity determines Business Associate has violated a material term of the Agreement and Business Associate has not cured the breach or ended the violation within the time specified by Covered Entity.

(c) Obligations of Business Associate Upon Termination.

Upon termination of this Agreement for any reason, Business Associate, with respect to protected health information received from Covered Entity, or created, maintained, or received by Business Associate on behalf of Covered Entity, will:

1. Retain only that protected health information which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities;

2. Return to Covered Entity or, if agreed to by Covered Entity, destroy the remaining protected health information that the Business Associate still maintains in any form;

3. Continue to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information to prevent use or disclosure of the protected health information, other than as provided for in this Section, for as long as Business Associate retains the protected health information;

4. Not use or disclose the protected health information retained by Business Associate other than for the purposes for which such protected health information was retained and subject to the same conditions set out at paragraphs (e) and (f) above under "Permitted Uses and Disclosures By Business Associate" which applied prior to termination; and

5. Return to Covered Entity [or, if agreed to by Covered Entity, destroy] the protected health information retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities.

(d) Survival. The obligations of Business Associate under this Section will survive the termination of this Agreement.

**Miscellaneous**

(a) Regulatory References. A reference in this Agreement to a section in the HIPAA Rules means the section as in effect or as amended.

(b) Amendment. The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law. No amendment to this Agreement will be effective until reduced to writing and signed by the parties.

(c) Interpretation. Any ambiguity in this Agreement will be interpreted to permit compliance with the HIPAA Rules.

(d) No Third Party Beneficiaries. There are no intended third party beneficiaries to this Agreement.

(e) Without in anyway limiting the foregoing, it is the parties' specific intent that nothing contained in this Agreement give rise to any right or cause of action, contractual or otherwise, in or on behalf of any Individual whose PHI is Used or Disclosed pursuant to this Agreement.

(f) Waiver. No provision of this Agreement may be waived except by an agreement in writing signed by the waiving party. A waiver of any term or provision will not be construed as a waiver of any other term or provision.

(g) Authority. The persons signing below have the right and authority to execute this Agreement for their respective entities and no further approvals are necessary to create a binding Agreement.

(h) Conflict. In the event of any conflict between the terms and conditions stated within this Agreement and those contained within any other agreement or understanding between the parties, written, oral or implied, the terms of this Agreement will govern. Without limiting the foregoing, no provision of any other agreement or understanding between the parties limiting the liability of the Business Associate to Covered Entity will apply to the breach of any term, condition or covenant contained in this Agreement by Business Associate.

(i) Headings. The headings of each section are inserted solely for purposes of convenience and will not alter the meaning of this Agreement.

(j) Governing Law. This Agreement will be construed in accordance with and governed by the laws of the State of Illinois.

**IN WITNESS WHEREOF,** the parties have executed this Agreement effective upon the date of the last signature hereto.

| **BUSINESS ASSOCIATE** | **COVERED ENTITY** |
|---|---|
| ADVANCED CORRECTIONAL HEALTHCARE, INC. | SANGAMON COUNTY JAIL |
| ______________________________ | ______________________________ |
| Jessica K. Young, Esq., CCHP-A<br>President & Chief Executive Officer | Authorized Agent |
| ______________________________ | ______________________________ |
| Date | Date |

Please complete and return via email to Contracts@advancedch.com

# AGREEMENT FOR THE MANAGEMENT OF THE HEALTH CARE PROGRAM SANGAMON COUNTY, ILLINOIS

This agreement, effective as of the date of the last signature hereto, entered into by and between the County of Sangamon, located in the State of Illinois, through the Sangamon County Sheriff in their official capacity (hereinafter referred to as "county"), and Advanced Correctional Healthcare, Inc. (hereinafter referred to as "ACH"), a Tennessee corporation.

## ARTICLE 1: ACH

1.1 DENTAL CARE. ACH will coordinate dental triage screenings. The county will pay for all costs associated with dental care.

1.2 ELECTIVE CARE. Elective care is defined as care which, if not provided, would not, in the opinion of ACH's prescriber, cause the patient's health to deteriorate. ACH will not pay for elective care for patients.

1.3 LABOR. Incarcerated patients will not be employed or otherwise utilized by ACH.

1.4 MEDICAL CLAIMS RE-PRICING. Upon the county's request, ACH will have the county's medical claims re-priced. Once claims are received, the applicable discount will be calculated (if any) and the integrity of the claim will be confirmed prior to returning the claim to the county for payment. ACH does not charge Sangamon County for this service (normally $17/claim) because Sangamon County is "grandfathered in" to it being included in their contract.

1.5 MENTAL HEALTH FIRST AID (MHFA) TRAINING. Mental Health First Aid is an 8-hour course that teaches you how to identify, understand and respond to signs of mental illnesses and substance use disorders. The training gives you the skills you need to reach out and provide initial help and support to someone who may be developing a mental health or substance use problem or experiencing a crisis. ACH provides MHFA training free to your officers.

1.6 MORTALITY AND MORBIDITY REVIEW. The County acknowledges (a) that it is the responsibility of the County to obtain a review of any death in the facility (as appropriate) pursuant to any applicable statutes (if any), such as 730 ILCS 210/et seq. Report of Deaths in Custody Act (b) that ACH cannot perform such reviews for a facility where it provides medical services, and (c) that the cost of such reviews will be borne by the County.

1.7 OFFICER WELLNESS & CRITICAL INCIDENT EMPLOYEE RAPID RESPONSE (CIERR). The CIERR program is a free staff support service. This program helps to support law enforcement (field and facility), first responders, and health care professionals and mitigate stress reactions in both personal and professional capacities. Contact with CIERR can be initiated by the professional in need of services or Freedom Behavioral Health, Inc. can initiate contact with notification from leadership within the department that the

individual would benefit from the services. Unless there are safety concerns, the contacts are treated as confidential.

1.7.1 FACE-TO-FACE WELLNESS CHECKS. **Upon the facility's request, ACH will** coordinate a QMHP at the rate of $175 per hour (with a minimum of 1 hour per visit). QMHP responsiveness will depend upon the amount of notice given, and the mutually agreed upon schedule.

1.8 OFF-SITE SERVICES. Off-site services are defined as medical services including, but not limited to, consultation services, dental care not performed on-site, diagnostic testing (including but not limited to covid testing), hospital services, medically-indicated emergency ground ambulance transportation, mental health services not performed on-site, laboratory services that are drawn off-site, and specialty services. Health care professionals have the freedom to provide care without limitation by approval process for outside care, etc. Each situation should be addressed on a case-by-case basis. ACH does not have standing orders. The county will pay for any costs associated with off-site services.

1.9 OTHER SERVICES AND EXPENSES. ACH may not provide and will not pay for any services, supplies and/or equipment which are not specifically contained in this agreement.

1.10 PHARMACEUTICALS. The county will pay for pharmaceuticals. The county agrees to allow home medications in the facility when they are able to be properly verified. Health care professionals have the freedom to provide care without limitation by prescription formulary, corporate approval for expensive medication, etc. Each situation should be addressed on a case-by-case basis. ACH does not have standing orders. ACH does not have a formulary.

1.11 PRISON RAPE ELIMINATION ACT OF 2003 (PREA).

1.11.1 MEDICAL SPECIALTY TRAINING. ~~Upon the county's request,~~ Spark Training, LLC will provide annual PREA medical specialty training for medical and mental health team members. (This training is in addition to the annual PREA training that is already required.) This training is usually presented electronically as a specialized track for medical and mental health team members, covering topics such as evidence collection and emotional support post-incident. Proof of this training is specifically requested by PREA auditors. **Proof of training shall be provided to the PREA Coordinator**.

1.11.2 VICTIM ADVOCACY. The facility has designated Freedom Behavioral Health, Inc. to provide post-incident victim advocacy as required in PREA Standard 115.21, and outside confidential support services as required in PREA Standard 115.53. Upon the county's **request, Freedom Behavioral Health, Inc. will provide a qualified mental health professional ("QMHP") (minimum Master's level) at the rate of $175 per hour** (with a minimum of 1 hour per visit). Services may be provided in-person or via tele-health (as mutually agreed upon). QMHP responsiveness will depend upon the amount of notice given.

1.12 STAFFING.

1.12.1 AGENCY / LOCUM TENENS (AS A LAST RESORT). Should these wages (this contract price) place an excessive burden on ACH to staff the facility, ACH may contract with Agency / locum tenens worker(s) to temporarily staff the facility, and the county agrees to pay the difference between the Agency / locum tenens rate(s) and ACH rate(s).

1.12.2 CANCELATIONS. If the county cancels a worker with less than 24 hours' notice prior to the start of the worker's shift, then the county agrees to pay for the worker's shift.

1.12.3 CREDITS. ACH pays its people well based on several factors including but not limited to experience in correctional healthcare. Therefore, ACH will not issue credits for differences in licensure; i.e., nurse practitioner vs. M.D., LPN vs. RN, etc. (For example, nurse practitioners are not necessarily paid less than M.D.s; LPNs are not necessarily paid less than RNs, etc.) Nursing credits owed to the county will be calculated at a rate of $41/hour. The amount of the credit owed will be deducted from the next month's invoice. The county will identify the position unfilled along with the dates and hours not provided per the terms of this contract with any credit taken.

1.12.4 MEAL BREAKS. It is understood and agreed that during unpaid meal break(s), workers are (1) allowed to leave their duty post and (2) completely relieved from all duties. If the facility requires the worker to be "on call" during meal break(s) so that they may respond to an emergency, then the worker is considered to be "on duty" and the meal break(s) will be paid for by the county.

1.12.5 MEDICAL PRESCRIBER. A prescriber will visit the facility weekly (or as otherwise agreed by the county and ACH) and will stay until their work is completed. We estimate (but do not limit) 2 hours per week of physician time and 3 hours per week of Advanced Practice Provider (such as a nurse practitioner or physician assistant) time. The county agrees to pay, on a monthly basis, for extra hours worked (at the prevailing wage and benefit rate of the particular worker). A prescriber will be available by telephone to the facility and health care teams on an on-call basis, 7 days per week, 24 hours per day, 365 days a year. The county will take a credit for hours unfilled by the Advanced Practice Provider per the terms stated in 1.12.3. ACH agrees to provide 104 hours of physician time per fiscal year and 156 hours per year of Advanced Practice Provider time. The parties agree that physician time may be adjusted week to week to accommodate needs of the parties such that the physician may be there one hour one week and three hours the next. It is understood and agreed that 104 hours of physician time shall be provided to and is being compensated for by the county for the term of this contract. The county will calculate the physician hours in the month before the end of the contract term and take any credits for unfilled time on the last invoice per paragraph 1.12.3.

1.12.6 MEDICAL RECORDS CLERK. ACH will coordinate on-site medical records clerk coverage for 18 hours per week on a schedule approved by the county. The county

agrees to pay, on a monthly basis, for extra hours worked (at the prevailing wage and benefit rate of the particular worker. For other absences, ACH endeavors to provide replacement coverage, and if it is unable to do so, the county will take a credit for the unfilled hours per paragraph 1.12.3 at the medical records clerk's wage rate.

1.12.7 NURSING. ACH will coordinate on-site nursing coverage for 208 hours per week on a schedule approved by the county. Those hours include a 40 hour per week RN who serves as the Health Services Administrator. ACH does not and will not put nurses on-call. The county agrees to pay for preapproved nursing hours overages only. The county has the sole ability to request and preapprove nursing overages. ACH understands and agrees that the county will not pay for nursing hours overages which were not preapproved and were not requested by the county. For absences, ACH endeavors to provide replacement coverage, and if it is unable to do so, the county will take a credit for the hours unfilled per paragraph 1.12.3.

1.12.8 ON-CALL QUALIFIED MENTAL HEALTH PROFESSIONAL (QMHP). Upon the facility's request, ACH will coordinate a QMHP at the rate of $150 per hour (with a minimum of 1 hour per visit). Services may be provided in-person or via tele-health (as mutually agreed upon). QMHP responsiveness will depend upon the amount of notice given, and the mutually agreed upon schedule.

1.12.9 QUALIFIED MENTAL HEALTH PROFESSIONAL (QMHP). ACH will coordinate an on-site QMHP for 80 hours per week on a schedule approved by the county. The county agrees to pay, on a monthly basis, for extra hours worked when requested by the county (at the prevailing wage and benefit rate of the particular worker). When an ACH person is absent, ACH will endeavor to provide replacement coverage. If it is unable to do so, the county will take a credit for the unfilled hours per paragraph 1.12.3 at the QMHP's wage rate.

1.12.10TELEHEALTH. The County desires no Telehealth services.

1.12.11TRAINING HOURS. Workers may receive all kinds of training, including but not limited to coaching, instructor-led training, job skills training, leadership training, management training, on-the-job training, orientation training, technology training (such as electronic medical records), safety training (such as OSHA), simulation training, and/or soft skills training. Those trainings may be annual, as-needed, face-to-face, formal, informal, ongoing, online, onsite, regularly scheduled, and/or virtual. Training hours are paid time and may result in hours overages, and the county agrees to pay those overages. The county will not pay for offsite training hours, such as attending a conference, unless the county is requiring the worker to attend it.

1.13 TUBERCULOSIS (TB) TESTING. ACH will perform TB skin tests as directed by the county. The county will pay for the TB serum and related supplies.

1.14 ACH understands that the purpose of this contract is to fulfill and satisfy the county's duty to provide medical and mental health treatment at the Sangamon County Jail for detained persons. ACH understands that no County employees are providing medical and/or mental

health services during the Contract terms set forth herein. ACH agrees that in the event t determines that it is not capable of addressing a medical or mental health need presented by an inmate within the facility, it will notify the county immediately.

## ARTICLE 2: THE COUNTY

2.1 ASQ SUICIDE PREVENTION TOOL. The county agrees to implement the nationally validated ASQ suicide prevention tool for use by the security team, as appropriate. For example, it's the county's responsibility to screen patients returning from court, as appropriate. Upon the county's request, ACH will coordinate the training. ACH will provide the current ASQ for County personnel to use on intake.

2.2 AUTOMATED EXTERNAL DEFIBRILLATORS (AEDs). The duty to purchase, provide, inspect, and maintain the facility's AEDs is, and always will be, vested in the county. This agreement does not result in the assumption of those duties by ACH or its people. While ACH and its people may assist the county, ultimately the county specifically retains the duties and obligations with respect to AEDs. ACH and its people will assume no responsibility for and will not be liable for the facility's lack of AED(s) and/or defective and/or non-working AEDs in the facility.

2.3 BIOMEDICAL WASTE DISPOSAL. The county will pay for biomedical waste disposal services at the facility. Typical biomedical waste expected in the medical unit would be bandages, dressings, gloves, hypodermic needles, laboratory containers, sharps, and syringes.

2.4 CARDIOPULMONARY RESUSCITATION (CPR) TRAINING. The duty to train the officer(s) is and always remains vested in and the responsibility of the county. ACH cannot be liable for failure to train correctional officers. Upon request of the county, ACH may provide CPR training for officer(s). ACH will not pay for CPR cards for county workers.

2.4.1 LUCAS CHEST COMPRESSION SYSTEM (or similar). The decision to purchase, provide, inspect, and maintain the facility's LUCAS device is, and always will be, vested in the county. This agreement does not result in the assumption of those duties by ACH or its people. While ACH and its people may assist the county, ultimately the county specifically retains the duties and obligations with respect to LUCAS devices. ACH and its people will assume no responsibility for and will not be liable for the facility's lack of a LUCAS device and/or defective and/or non-working LUCAS device in the facility.

2.5 CO-PAY. Patients will be seen by the health care team regardless of their ability to pay.

2.6 COUNTY'S POLICIES & PROCEDURES. As with training, the facility is responsible for its policies and procedures. ACH does not have medical policies and procedures because every state and each correctional facility are different. Staff will work within the facility's policies and procedures. All policies and procedures, including officer communications forms, will at all times remain the property of the county and will remain at the facility.

Upon request of the county, ACH may make recommendations to the county's existing health care policies and procedures for the county to implement or deny. If the county does not have policies and procedures, ACH may recommend the National Commission on Correctional Healthcare policy templates as a starting point to be made site-specific by the facility. Health care professionals have the freedom to provide care without limitation by prescription formulary, approval process for outside care, etc. Policies and procedures regarding medical care should be treated as guidelines, not inflexible rules; they are not intended to establish a standard of medical care; nor are they a substitute for common sense. Each situation should be addressed on a case-by-case basis. ACH does not have standing orders. ACH does not have a formulary. **It is the jail's responsibility, not ACH's** responsibility, to have medical policies and procedures in place per state law. (For example, jails without vendors are still required by state law to have medical policies and procedures.) ACH recommends the jail keep at least 1 original **(in jail administration's** office) and 1 copy (in medical unit) of the medical policies and procedures for the security **team's reference, and that jail administration review and approve them annually; however,** the maintenance, review, and approval of the medical policies and procedures are not **ACH's responsibility. ACH manages contracts with medical professionals who are able to** exercise independent medical judgment based upon their education, training, and experience (and do not need medical policies and procedures to tell them what to do).

**The County's Policies** are attached as Ex. 1, current as of the date of signing. ACH workers assigned to Sangamon County will have access to the live version of this document through their personal log-ins and passwords provided to them. ACH may request printed copies of updated policies as needed.

2.7 DUTY TO PROTECT PATIENTS. The non-delegable duty to protect patients is, and always will be, vested in the county. This agreement does not result in the assumption of a non-delegable duty by ACH. As such, the county specifically retains the duty and obligation for security of the patients. For example, supervision of patients on suicide watch **is the county's responsibility.** For example, non-medical monitoring and/or observation of patients (such as on camera) **is the county's responsibility.** This duty also extends to the control of patient movement. ACH and its personnel will assume no responsibility for the movement of patients and assume no responsibility for patient protection at any time

2.8 ELECTRONIC COMMUNICATIONS. The county agrees to provide to ACH copies of **any electronic communications between ACH and ACH's** workers and independent contractors in the county's **possession (including stored on the** county's **email servers) as** requested by ACH. The county agrees to treat electronic communications between ACH and its workers and independent contractors as confidential and agrees not to share those communications with any third party unless required by law.

2.9 **LICENSURE. It is the county's responsibility to hold the necessary** certifications, licensures and permits (including but not limited to, and as appropriate: CLIA waiver, DEA registration for the physical location, hazardous waste disposal permits, medical clinic license, other lab licenses, pharmacy license, state-controlled substance registration, etc.).

2.10 MEDICAL AND MENTAL HEALTH RECORDS. Patient medical and mental health records will always be the property of the county and will remain in the facility. The county agrees to provide copies of those records to ACH when requested.

2.11 MEDICAL EQUIPMENT (DURABLE). The county pays for medical equipment. At the county's request, ACH will assist the county in securing the equipment at cost-effective pricing. Typical durable medical equipment expected in a medical unit would be: exam table, exam stool, ophthalmic / otoscope, peak flow meter, digital thermometer, stethoscope, X-large and large blood pressure cuffs, refrigerator (small), and scales. Medical equipment will be the property of the county.

2.12 MEDICAL SUPPLIES (DISPOSABLE). The county will pay for disposable medical supplies intended for one-time use, not to include durable or reusable medical supplies. Typical disposable medical supplies expected in a medical unit would be alcohol preps, ammonia ampules, bandages, blood sugar strips, cotton-tip applicators, gauze pads, gloves, lancets, med cups, medical tape, O2 tubing, peak flow mouth pieces, PPE (personal protective equipment), pregnancy tests, saline, sterile water, syringes, tongue blades, and urine test strips.

2.13 MOBILE SERVICES. Mobile services are defined as laboratory services that are drawn on-site and sent off-site for testing, and any ancillary medical services in which a provider comes on-site to perform work using the provider's equipment and/or staff, including, but not limited to X-ray services. The county will pay for all costs associated with mobile services.

2.14 NALOXONE ("NARCAN"). The county agrees to purchase naloxone and have its security team trained in the administration of naloxone. Upon the county's request, ACH will coordinate the training.

2.15 NON-MEDICAL CARE OF PATIENTS. The county will provide and pay for non-medical needs of the patients while in the facility, including, but not limited to: daily housekeeping services; dietary services, including special supplements, liquid diets, or other dietary needs; building maintenance services; personal hygiene supplies and services; clothing; and linen supplies.

2.16 NURSING LICENSURE. ACH's preference is to run a health care program using RNs. Ultimately, the level of nursing licensure ACH provides at the facility is the county's decision (RN vs. LPN). ACH does not and will not put nurses on-call.

2.17 OFFICE EQUIPMENT (DURABLE). The county will provide use of county-owned office equipment and utilities in place at the facility's health care unit. Typical office equipment expected in a medical unit would be a locking file (recommended four-drawer); paper punch; staple remover; stapler; cabinet for storing medical supplies such as Band-Aids, gauze, etc.; computer; fax machine; copier / printer; and toner. Upon termination of this agreement, the office equipment will be in good working order, with allowances made for reasonable wear and tear.

2.18 OFFICE SUPPLIES (DISPOSABLE). The county will provide disposable office supplies, such as medical charts, paper, pens, staples, and Post-It notes which are required for the provision of patient health care services.

2.19 OFFICER TRAINING. The duty to train the officer(s) is and always remains vested in and the responsibility of the county. ACH cannot be liable for failure to train correctional officers. Upon request of the county, ACH may assist in training for officer(s) on certain topics as determined by the county. The county is solely responsible for overall operation of the facility. The county maintains ultimate responsibility for training and supervising its correctional officers, including but not limited to emergency procedures, and ensuring sick calls are passed along to the medical team

2.20 PREVENTATIVE SERVICES. If the county requests preventative services (such as flu shots, covid vaccinations, etc.) for incarcerated patients or county workers, the county will pay for it. ACH may provide, but will not pay for, preventative services. Upon the county's request, ACH will secure the vaccination (for example) and related supplies (if applicable) through the correctional pharmacy or health department, then bill the county for any costs, and the county agrees to pay.

2.21 SECURITY. The county will maintain responsibility for the physical security of the facility and the continuing security of the patients. The county understands that adequate security services are necessary for the safety of the agents, workers, and subcontractors of ACH, as well as for the security of patients and officer(s), consistent with the correctional setting. The county will provide security sufficient to enable the health care team to safely provide the health care services described in this agreement. The county will screen ACH's proposed staff to ensure that they will not constitute a security risk. The county will have final approval of ACH's workers and independent contractors regarding security/background clearance. Should the facility unreasonably withhold security clearance and/or withhold security clearance on an unreasonably high quantity of proposed staff, it places an excessive burden on ACH to staff the facility. In that case, ACH may hire Agency worker(s) to temporarily staff the facility, and the county agrees to pay

## ARTICLE 3:
## COMPENSATION/ADJUSTMENTS

3.1 ANNUAL AMOUNT/MONTHLY PAYMENTS. The county agrees to pay $1,176,810.00 per year to ACH under this agreement. To do so, the county agrees to make monthly payments of $98,067.50 to ACH during the term of this agreement. Both parties agree this is a fair and reasonable price. ACH will bill the county approximately 30 days prior to the month in which services are to be rendered. The county agrees to pay ACH within approximately 30 days of receipt of the bill..

3.1.1 ELECTRONIC PAYMENTS. The county agrees to pay ACH electronically through the Automated Clearing House. If the county does not want to pay electronically, then the county agrees to pay an additional 2% per month charge. If the county believes it is statutorily exempt, please provide the statute citation.

3.1.2 ANNUAL AMOUNT UPON RENEWAL. Upon the annual anniversary of the commencement of services under this agreement, the annualized amount of increase for compensation and per diem rates (and any other contracted rates, including the on-call QMHP rate, for example) will be the rolling 12-month Consumer Price Index (CPI) for Medical Care or 7%, whichever is higher.

3.1.3 CREDITS. Any credits due will first be applied to any outstanding invoices.

3.2 **FUNDING THE FACILITY'S HEALTH CARE PROGRAM. It is ultimately the responsibility of the county to appropriately fund the facility's health care program. As a result, ACH's health care program at the** facility (staffing, etc.) is customized and approved by the county.

3.3 QUARTERLY ADJUSTMENTS.

3.3.1 AVERAGE DAILY POPULATION (ADP). The ADP will be determined from the facility census records on a quarterly basis. For billing purposes the ADP will be 250. Patients who are not presently incarcerated in the facility (i.e., persons on electronic monitoring or probation, or who are hospitalized, or in halfway housing or early release housing) should not be counted in either ADP reported to ACH by the county. The ADPs reported to ACH should only include those patients presently incarcerated in the facility.

3.3.2 PER DIEM. When the ADP exceeds or falls below the contracted rate in any calendar quarter, the compensation variance will be figured on the average number of patients above or below the contracted ADP for that quarter multiplied by the per diem rate of $0.43 per patient per day. (Example: If the ADP for a quarter is 10 above the contracted ADP, additional compensation due will be calculated as follows: 10 x $0.43 x 91. Likewise, if the ADP for a quarter is below the contracted ADP, credits will be due to the county using the same formula.)

3.3.3 RECONCILIATION. Any contract amount in arrears (or amount to be credited back to the county) will be settled through reconciliation on the first monthly invoice prepared after reconciliation. The county agrees to notify ACH of requests for credits within 90 days of determining that credits are due.

## ARTICLE 4: TERM AND TERMINATION

4.1 TERM. The term of this agreement will begin on December 1, 2023 at 12:01 A.M. and will continue in full force and effect until November 30, 2025 at 11:59 P.M., unless earlier terminated, extended, or renewed pursuant to this agreement. This agreement will automatically renew for successive 1 -year periods unless either party gives 30 days' written notice prior to the end of a term.

4.2 TERMINATION.

4.2.1 TERMINATION FOR LACK OF APPROPRIATIONS. It is understood and agreed that this agreement will be subject to annual appropriations by the county. If funds are not appropriated for this agreement, then upon exhaustion of such funding, the county will be entitled to immediately terminate this agreement. Recognizing that such termination may entail substantial costs for ACH, the county will act in good faith and make every effort to give ACH reasonable advance notice of any potential problem with funding or appropriations. The county agrees to pay for services rendered up to the point of termination.

4.2.2 90-DAY OUT CLAUSE. Notwithstanding anything to the contrary contained in this agreement, the county or ACH may, without prejudice to any other rights they may have, terminate this agreement by giving 90 days' advance written notice to the other party. If the county gives ACH less than 90 days' advance written notice, the county agrees to pay to ACH 3-month's contract price as an early termination fee.

## ARTICLE 5:
## GENERAL TERMS AND CONDITIONS

5.1 ADVICE OF COUNSEL. Each of the parties (a) has had the opportunity to seek counsel, legal or otherwise, prior to entering into this agreement, (b) is freely entering into this agreement of his/her or its own volition, and (c) understands and agrees that this agreement will be construed as if drafted by both parties and not by one party solely.

5.2 AUTHORITY. The persons signing below represent that they have the right and authority to execute this agreement for their respective entities and no further approvals are necessary to create a binding agreement.

5.3 COMPLIANCE WITH FEDERAL, STATE AND LOCAL LAWS. The county and ACH agree that no party will require performance of any ACH or county worker, agent or independent contractor that would violate federal, state and/or local laws, ordinances, rules and/or regulations. If the county elects not to follow any federal, state, or local law, the parties agree the county will be responsible for all costs associated with noncompliance. The county will be responsible for any additional services required at the facility as the result of governmental (including, but not limited to, Centers for Disease Control and Prevention, Department of Justice, Drug Enforcement Administration, health department, Immigration and Customs Enforcement, Department of Corrections, Federal Bureau of Prisons, or United States Marshals Service) investigation, mandate, memorandum, or order. Should ACH be asked to provide substantial new services, the county will pay for it, unless specifically agreed upon in writing between ACH and the county.

5.4 COUNTERPARTS; HEADINGS. This agreement may be executed in counterparts, each of which will be an original and all of which will constitute one agreement. The headings contained in this agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this agreement. The term "patient" includes incarcerated detainees and inmates.

5.5 EMAIL ACCOUNTS. As a general rule, ACH will not provide frontline email accounts. If the county would prefer that ACH issue email accounts, then the county agrees to pay the additional costs for the licenses (i.e., in 2022, ~$72/year per email account).

5.6 ENTIRE AGREEMENT; AMENDMENT. This agreement represents the entire understanding of the parties with respect to the subject matter hereof, supersedes and cancels all prior agreements, understandings, request(s) for proposals, request(s) for proposals responses, arrangements, or representations between the parties with respect to such subject matter, and may only be amended by written agreement of both parties. The parties agree that their performances hereunder do not obligate either party to enter into any further agreement or business arrangement.

5.7 EQUAL EMPLOYMENT OPPORTUNITY. It is the policy and practice of ACH to provide equal employment opportunities to all workers and applicants for employment without regard to race, color, religion, sex, national origin, disability, age, or genetics. This policy applies to all terms and conditions of employment including, but not limited to, recruitment, hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, benefit plans, all forms of compensation, and training.

5.8 EXCUSED PERFORMANCE. In case performance of any terms or parts hereof will be delayed or prevented because of compliance with any law, decree, or order of any governmental agency or authority of local, state, or federal governments or because of riots, public disturbances, strikes, lockouts, differences with workers, fires, floods, Acts of God, pandemics, or any other reason whatsoever which is not within the control of the parties whose performance is interfered with and which, by the exercise of reasonable diligence, said party is unable to prevent, the party so suffering may at its option, suspend, without liability, the performance of its obligations hereunder during the period such cause continues.

5.9 FILMING. ACH does not consent to the filming of its workers for any commercial purpose including, but not limited to, documentaries, docuseries (including, but not limited to, "60 Days In"), etcetera. If the facility and/or county decide to engage in such a project, they agree to notify ACH's legal department at least 90 days prior to filming, at 309-692-8100; facsimile: 309-214-9977; or email: Contracts@advancedch.com. ACH reserves the right to terminate the agreement prior to the beginning of the filming of such a project. ACH will have no obligation under this agreement to maintain insurance coverage against any loss or damage caused or necessitated by the filming of such a project. The county agrees to hold harmless and indemnify ACH and its workers against any loss or damage, including reasonable attorneys' fees and other costs of litigation, caused or necessitated by the filming of such a project.

5.10 FURTHER ACTS. The parties agree to perform any further acts and execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this agreement.

5.11 GOVERNING LAW. This agreement will be governed by the laws of the State of Illinois (without reference to conflicts of laws principles).

5.12 INDEPENDENT CONTRACTORS. ACH may engage certain health care professionals as independent contractors. The county understands and acknowledges that some physicians, advanced practice providers, nurses, mental health workers, consultants, specialists, and other allied health professionals are not employees or associates of ACH; and that ACH is not responsible for their opinions, decisions or medical procedures performed.

5.13 INTERGOVERNMENTAL AGREEMENTS (IGAs) (PIGGYBACK). ACH agrees to allow the county to authorize other government agencies to purchase the proposed items by issuance of a purchase order at the same terms and conditions as this agreement, and to make payments directly to ACH during the period of time that this agreement is in effect.

5.14 NO GRANT OF RIGHTS. Each of the parties understands and agrees that no grant or license of a party's rights in any patent, trademark, trade secret, copyright and/or other intellectual property right is made hereby, expressly or by implication.

5.15 NO RELATIONSHIP OR AUTHORITY. The parties agree that ACH will at all times be an independent contractor in the performance of the services hereunder, and that nothing in this agreement will be construed as or have the effect of constituting any relationship of employer/employee, partnership, or joint venture between the county and ACH. ACH does not have the power or authority to bind the county or to assume or create any obligation or responsibility on the county's behalf or in the county's name, except as otherwise explicitly detailed in this agreement, and ACH will not represent to any person or entity that ACH has such power or authority. ACH will not act as an agent nor will ACH be deemed to be an employee of the county for the purposes of any employee benefit program.

5.16 NOTICE. Any notice required or permitted to be given hereunder will be in writing and delivered to the respective addresses in this section or such other addresses as may be designated in writing by the applicable party from time to time and will be deemed to have been given when sent. To the county: Sangamon County Jail, jack.campbell@sangamonil.gov;tim.eggleston@sangamonil.gov; larry.beck@sangamonil.gov;william.smith@sangamonil.gov; tmpowell@heylroyster.com. To ACH: Advanced Correctional Healthcare, Inc., Attn: Legal, 720 Cool Springs Blvd., Suite 100, Franklin, TN 37067; facsimile: 309.214.9977; email: Contracts@advancedch.com.

5.17 OTHER CONTRACTS AND THIRD-PARTY BENEFICIARIES. The parties acknowledge that ACH is not bound by or aware of any other existing contracts to which the county is a party and which relate to the provision of health care to patients at the facility. The parties agree that they have not entered into this agreement for the benefit of any third person(s) and it is their express intention that this agreement is intended to be for their respective benefits only and not for the benefits of others who might otherwise be deemed to constitute third party beneficiaries thereof.

5.18 MEETINGS. ACH representatives shall meet, in accordance with a schedule agreed to by the SHERIFF or his designee and ACH, with the SHERIFF or his designee concerning procedures within the Sangamon County Jail and issues of significance which may warrant changes in health-related procedures or other matters, which either party deems necessary.

5.19 SHERIFF'S POLICES AND PROCEDURES for the JAIL. ACH shall operate within the requirements of the Sheriff's Policies and Procedures for the jail which directly relate to the provision of medical services and other Policies and Procedures of the Sheriff which may impact the provision of medical services. Such Polices and Procedures may change from time to time; if so, ACH will be promptly notified and shall operate within all policies as modified. (See the Attached Policies marked as Ex. A).

5.20 INDEMNIFICATION. As it pertains to claims filed, ACH, the Sheriff, and the county agree that in the event of an adverse verdict against both ACH (or one of its agents) and the Sheriff and/or county (or one of its agents/indemnitees) resulting in an indivisible judgment against them, the parties agree to mediate their respective liabilities in an effort to reach a settlement agreement. If a resolution cannot be reached by agreement, the parties agree to submit to binding arbitration. The parties agree to reimburse the other for any amount paid to the Plaintiff that exceeds the jury's or the arbitrator's determination of percentage of fault attributable to it. This process would apply only to cases filed after the date this agreement goes into effect.

5.21 INSURANCE LIMITS. ACH shall procure and maintain in effect throughout the term of this Agreement insurance policies with coverage for the types specified and for not less than the amounts specified in this Section.

5.21.1 Commercial General Liability Insurance Policy with limits of $1,000,000 per occurrence and $1,000,000 aggregate

5.21.2 Workers Compensation Insurance as required by Illinois law.

5.21.3 Employers' Liability Insurance with limits of $1,000,000 (one million) per occurrence.

5.21.4 Professional Liability Insurance which covers and does not exclude civil rights claims with limits per claim of $1,000,000 (one million dollars) per occurrence per the COI provided by ACH. ACH shall require all subcontractors and independent contractors to meet this requirement. ACH will name the county and the Sheriff's office as additional insureds for this coverage.

5.22 SEVERABILITY. If any provision of this agreement, or any portion thereof, is found to be invalid, unlawful, or unenforceable to any extent, such provision will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this agreement will continue unaffected in full force and effect. The parties will negotiate in good faith an enforceable substitute provision for such invalid provision that most nearly achieves the same intent and economic effect.

5.23 TRAINING MATERIAL. Information in any training material should be treated as guidelines, not rules. The information presented is not intended to establish a standard of medical care and is not a substitute for common sense. The information presented is not legal advice, is not to be acted on as such, may not be current, and is subject to change without notice. Each situation should be addressed on a case-by-case basis.

5.24 WAIVER. Any waiver of the provisions of this agreement or of a party's rights or remedies under this agreement must be in writing to be effective. Failure, neglect, or delay by a party to enforce the provisions hereof or its rights or remedies at any time, will not be construed as a waiver of such party's rights or remedies hereunder and will not in any way affect the validity of this agreement or prejudice such party's right to take subsequent action.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals the date and year written below.

**ADVANCED CORRECTIONAL HEALTHCARE, INC.**

| | |
|---|---|
| Jessica K. Young, Esq., CCHP-A<br>President & Chief Executive Officer | 9/10/24<br>Date |

**COUNTY OF SANGAMON, ILLINOIS**

| | |
|---|---|
| Authorized Agent | 9-10-24<br>Date |

Please complete and return via email to Contracts@advancedch.com